IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELISSA J. CORCORAN          *
      PLAINTIFF
                        *
   v.                       CIVIL NO. SKG-08-913
                        *
MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY *
      DEFENDANT
                        *

       *    *    *    *    *    *    *

<u>MEMORANDUM OPINION</u>

Plaintiff, Melissa J. Corcoran, by her attorney, Anthony Mignini, filed this action for judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 401-434.

This case has been referred to the undersigned magistrate judge for all proceedings by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. (Papers No. 5, 7, 8.) Currently pending before the Court are cross motions for summary judgment. (Papers No. 17, 22.) No hearing is necessary in this case. <u>See</u> Local Rule 105.6. For the reasons discussed below, the Court AFFIRMS the decision of the Commissioner. Accordingly, the Court DENIES plaintiff's Motion for Summary Judgment and GRANTS defendant's Motion for Summary Judgment.

I. Procedural History

Ms. Corcoran filed an application for a Period of Disability and for DIB on April 25, 2004, alleging disability beginning July 2, 2003,

due to a combination of impairments, including a cervical spine injury and bipolar manic depression.  ®. 71.)  Later, Ms. Corcoran alleged additional impairments in the form of lower back pain and numbness and weakness in her left leg.  ®. 64.)  The Administration denied the application both initially and upon reconsideration.  ®. 48-49.)

On August 17, 2005, the claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  ®. 35.)  The claimant, represented by Ms. Karen Levian, appeared and testified at a hearing held on June 27, 2006, before ALJ Judith Showalter.  ®. 500-55.)  The alleged "closed period" of disability under 20 C.F.R. § 404.321 is July 2, 2003, to September 12, 2006.  ®. 28.)  On September 12, 2006, the ALJ issued a decision finding the claimant not disabled within the meaning of the Act.  ®. 16-28.)

Ms. Corcoran thereafter filed a timely appeal with the Appeals Council.  ®. 15.)  On February 25, 2008, the Appeals Council denied the claimant's request for review ®. 6-9), rendering the ALJ decision the final decision of the Commissioner.

Plaintiff then timely filed the instant action in the District Court for judicial review of the ALJ decision, pursuant to 42 U.S.C. § 405(g).  (Paper No. 1.)  The transcript having been filed with the Court, the case is now ripe for summary judgment.

II.  Factual Background

**Medical Evidence ®. 115-480)**

On March 18, 1996, Ms. Corcoran visited The Orthopedic Center, where she complained of a tingling sensation in her hands and pain in her left knee.  ®. 142).  Dr. Thomas Stauch diagnosed Ms. Corcoran

with "very mild carpel tunnel syndrome" and "a probable meniscus tear in her left knee." (R. 143).

When the tingling sensation in Ms. Corcoran's hands persisted, Dr. Stauch referred Ms. Corcoran to Dr. Glenn Hardy. (R. 140). On April 26, 1996, Dr. Hardy performed a nerve conduction study on Ms. Corcoran. (R. 140). The study showed "no evidence for significant nerve entrapment at the wrist or elbow [and] no evidence for significant peripheral polyneuropathy." (R. 139).

When Ms. Corcoran's knee pain persisted, Dr. Stauch performed arthroscopic surgery. (R. 137-38).

On May 1, 1997, Ms. Corcoran again visited The Orthopedic Center. (R. 136). She complained of neck, right shoulder, and arm pain. Id. An MRI taken on May 13, 1997 revealed that Ms. Corcoran had a herniated disc at the 5-6, 6-7 levels. (R. 133). Dr. Myron Szczukowski examined Ms. Corcoran two days later and opined that the herniation produced a radiculopathy C6-7 on the right side. (R. 132).

On May 23, 1997, Dr. Szczukowski performed an anterior cervical diskectomy and fusion at C5-6 and C6-7, a right anterior iliac bone graft, and anterior plating of C5-6 and C6-7. (R. 129).

On November 5, 1997, Ms. Corcoran informed Dr. Szczukowski that "her strength [had] returned," that "she fe[lt] much stronger," that "there [was] no significant neck pain," and that she no longer experienced "any overt numbness or tingling." (R. 124). Still, Ms. Corcoran complained that she occasionally suffered "pain and spasms in her upper back and some achiness down into her arm." Id. Dr.

Szczukowski examined Ms. Corcoran and ruled out carpal tunnel syndrome based on her negative response to a Tinel's test ®. 124).

On January 7, 1998, Ms. Corcoran complained to Dr. Szczukowski that she suffered from "pain in the posterior aspect of her neck and down into the right shoulder area." ®. 123). Dr. Szczukowski examined Ms. Corcoran and opined that her pain was "musculoligamentous in nature." Id.

Two weeks later, Dr. Mary Burgoyne examined Ms. Corcoran, who presented with the same complaint. ®. 121-22). Dr. Burgoyne found "some features suggestive of fibromyalgia," but did not find "stress forward evidence of fibromyalgia." Id. Dr. Burgoyne instructed Ms. Corcoran "to continue the Clonopin" and "suggested that [she] look into a weight loss and exercise program." Id.

On April 24, 1998, Ms. Corcoran visited Memorial Hospital, where she had her knees x-rayed. ®. 119). The x-rays indicated mild degenerative changes and small joint effusion in her left knee, and mild hypertrophic changes in her right knee. Id.

On May 4, 1998, Ms. Corcoran visited The Orthopedic Center. She complained of pain in both knees, and reported that approximately three weeks prior, she had injured her knees while roller skating. ®. 118). Dr. Stauch diagnosed Ms. Corcoran's pain as "secondary to [a] direct chondral injury," and opined that the injury would "slowly resolve." Id.

On March 18, 1999, Ms. Corcoran visited the Shore Behavioral Health System's Emergency Department, where she was diagnosed with depression and situational stress. ®. 144). Earlier that evening,

following an argument between her husband and son, Ms. Corcoran had gone to her bedroom, begun crying, crawled into a closet, and tried to scratch her face with a ball point pen.  Id.  Before she was discharged, Ms. Corcoran stated that she "fe[lt] better and much calmer," and that she was "unsure as to why she lost it."  Id.

On March 16, 2000, Ms. Corcoran visited The Orthopedic Center, where she complained of neck, shoulder, lower back, and forearm pain. ®. 321).  Dr. Szczukowski diagnosed her as having a cervical strain, rule out herniated nucleus pulposis.  Id.  He provided Ms. Corcoran with a neck collar and a Medrol dose pack, and prescribed Vicodin. Id.

A month later on April 15, Ms. Corcoran visited Memorial Hospital, where she complained of lower back and left buttock pain. ®. 148-51).  The attending physician diagnosed acute sciatic radiculopathy and prescribed Flexeril and Percocet.  Id.

On April 24, Ms. Corcoran visited The Orthopedic Center, again with back pain.  ®. 318).  Dr. Hardy diagnosed her with a lumbosacral strain, rule out underlying annular disc tear.  Id.

From October 20, 2000 to December 11, 2005, Drs. Efigenio Bautista and Martha Krampf diagnosed and treated Ms. Corcoran's bipolar and attention deficit hyperactivity disorders.  The medications which they prescribed include Depakote, Zyprexa, Neurotin, Valproic Acid, Effexor, Straterra, Trileptal, Cymbalta, and Aderal. ®. 234-40; 263-78; 404-16; 436-44; 449-80).

On March 13, 2001, Ms. Corcoran presented at Memorial Hospital, with left ankle and knee pain.  ®. 160-63).  She reported that earlier

in the day, she had fallen in a hallway at the elementary school where she worked.  Id.  An MRI revealed a possible suprapatellar joint effusion and mild medial compartment osteoarthritis, but showed no evidence of fracture or dislocation.  ®. 159).  The attending physician diagnosed Ms. Corcoran with a sprain.  ®. 161).

Five days later, Ms. Corcoran developed right shoulder, arm, and back pain.  ®. 202).  Initially, Ms. Corcoran's back pain was treated conservatively.  ®. 184).  However, after an MRI revealed a disk herniation at the C4-5 level and a pain management consultation proved unsuccessful, Dr. Szczukowski elected to again perform surgery on Ms. Corcoran's back.  ®. 171; 182-85; 202).  On September 11, 2001, Ms. Corcoran underwent a cervical diskectomy infusion with anterior plating at C4-5, right iliac bone graft, and removal of the plate at C5-6, C6-7, from her previous diskectomy and fusion.  ®. 182-85).

From November 2001 to April 2002, Ms. Corcoran periodically returned to The Orthopedic Center with right shoulder and arm pain. ®. 293-303).  On November 28, Dr. Szczukowski instructed Ms. Corcoran "to work on her work setting, ergonomics, and appropriate chair height," and "to cut back on [her] therapy."  ®. 301).  On January 10, he diagnosed right rotator cuff tendonitis and injected Ms. Corcoran's shoulder with Dalalone and Lidocaine.  ®. 300).  On February 7, he injected her with DepoMedrol and Lidocaine.  ®. 299).  On March 14, he opined that Ms. Corcoran had "an impingement problem" with her shoulder.  ®. 297-98).  On April 19, he performed arthroscopic surgery on her shoulder.  ®. 296).

On May 23, Ms. Corcoran reported less pain in her shoulder, and on July 24, she reported an "increased range of motion" and "decreased pain, numbness, and tingling."  ®. 294-95).  However, on September 23, after having returned to work for a month or so, Ms. Corcoran once again informed Dr. Szczukowski that she suffered from right shoulder pain and tingling in her right forearm. ®. 293).

On July 29, 2002, Ms. Corcoran visited Memorial Hospital for bilateral flank pain.  ®. 194-201).  Dr. Jane Wang diagnosed the pain as an acute back strain and advised Ms. Corcoran to follow up with her primary physician, Dr. Daniel Konick, within five days.  Id.

On August 22, 2002, Ms. Corcoran visited Multi-Specialty Health Care, where Dr. Douglas Shepherd conducted an orthopedic IME.  ®. 202-05).  Dr. Shepherd opined that Ms. Corcoran suffered from a seventy percent impairment to her cervical spine, a twenty percent impairment to her right shoulder, and a twenty percent impairment to her left knee.  Id.

On October 17, 2002 and June 2, 2003, Ms. Corcoran underwent a psychiatric evaluation.  ®. 164-69).  Dr. Stephen Siebert opined that Ms. Corcoran had an underlying bipolar disorder and a chronic depressive disorder caused by her March 13, 2001 injury.  ®. 168).  He further opined that Ms. Corcoran suffered mild impairments of activities of daily living, social functioning, and concentration, persistence, and pace, but that she experienced no episodes of decompensation.  Id.  Finally, he opined that Ms. Corcoran suffered "a ten percent permanent partial psychiatric impairment" as a result of her March 13, 2001 injury.  ®. 169).

On March 13, 2003, Ms. Corcoran visited Memorial Hospital for neck and shoulder pain and numbness in her left arm. (R. 241-53). The attending physician diagnosed her with a pinched nerve and prescribed pain medication. (R. 248).

On July 25, 2003, Ms. Corcoran visited Dr. Peter Schilder for right sided head pain. (R. 254-56). Dr. Schilder attributed Ms. Corcoran's head pain to occipital neuralgia. (R. 256). He also diagnosed Ms. Corcoran with "left ulnar neuropathy secondary to a cubital fossa syndrome." Id.

On October 24, 2003, Ms. Corcoran visited The Orthopedic Center for neck pain. (R. 292). Dr. Benjamin Knox diagnosed her with cervical radiculopathy and probable pseudoarthrosis, and "recommend[ed] checking a new MRI." Id. The MRI, taken on November 1, revealed "extensive postsurgical change from C4 through C7," but showed no evidence of "structural neuro compression." (R. 257; 291). Dr. Knox recommended an epidural steroid injection at C6-7, which if only temporarily effective, "would make the case for repairing the pseudoarthrosis." (R. 291).

On December 4, 2003, Ms. Corcoran reported that "she got no relief" from the injection. (R. 290). After Dr. Knox informed Ms. Corcoran that it would be "reasonable to proceed with surgery," Ms. Corcoran indicated that "she would like to have this done." Id. Accordingly, on December 29, Dr. Knox performed surgery to repair Ms. Corcoran's pseudoarthrosis. (R. 322-31). Specifically, Dr. Knox performed a posterior cervical fusion with left iliac bone graft. Id.

On February 13, 2004, Ms. Corcoran informed Dr. Knox that while her arm pain had abated, she continued to have neck pain.  (R. 332). Dr. Knox opined that Ms. Corcoran's neck pain may be chronic.  Id.

On March 24, Ms. Corcoran visited Memorial Hospital, where she complained of headache, tingling on the left side of her face, left arm pain, and nausea.  (R. 337-47).  An MRI revealed "no change" from a study conducted the day after Ms. Corcoran's December 29 surgery.  (R. 346).  The attending physician diagnosed Ms. Corcoran with cervical radiculopathy and administered morphine and Reglan.  (R. 344).

On July 12, 2004, Ms. Corcoran underwent a physical residual functional capacity assessment.  (R. 186-93).  According to the assessment, Ms. Corcoran could lift up to twenty pounds occasionally and ten pounds frequently; could stand or walk for about six hours in an eight-hour day; could sit for about six hours in an eight-hour day; and had an unlimited ability to push or pull with her upper and lower extremities (R. 187).  Additionally, the assessment indicated that while Ms. Corcoran had "some residual pain" from her surgeries, there were no "significant functionally limiting findings" (R. 188). Finally, the assessment indicated that Ms. Corcoran's symptoms were only partially credible because she alleged lower back pain, and yet her MRI was unremarkable.  Id.

On September 14, Ms. Corcoran visited Maryland Primary Care Physicians, where she complained of neck pain.  (R. 348).  The treating doctor diagnosed Ms. Corcoran with chronic neck pain, bipolar depression, and occipital neuralgia, and increased the dosage of Ms. Corcoran's Lexapro.  (R. 349).

On September 29, Ms. Corcoran underwent a second physical residual functional capacity assessment ®. 352-59). Dr. W.D. Hakkarinen, the medical consultant concluded that Ms. Corcoran could occasionally lift ten pounds and could frequently lift less than ten pounds; could sit for about six hours in an eight-hour day; and had an unlimited ability to push or pull with her upper and lower extremities. ®. 352). While Dr. Hakkarinen noted Ms. Corcoran's decreased right grip strength, he found that her activities of daily living, which included driving, shopping, and performing self care independently, indicated that she was capable of performing sedentary work. ®. 352-60).

On November 8, 2004, Dr. Parviz Sahandy evaluated Ms. Corcoran. ®. 361-68). He observed that Ms. Corcoran was "tense, bitter, depressed, angry, and resentful," but that she "was cooperative and did not reveal any hostility towards the interviewer." ®. 363). He also observed that Ms. Corcoran appeared well compensated, displaying no evidence of psychosis, delusional ideas, or other strange behavior during the interview. ®. 364). He diagnosed her with bipolar disorder, ADHD, learning disabilities, anxiety, and a few panic episodes, but noted that "with treatment most of [these] problems have come under control." Id.

On December 8, Ms. Corcoran underwent Psychiatric Review Technique and mental RFC assessments. ®. 368-86). During the former, Dr. Monica Greene, a state agency examiner found that Ms. Corcoran's bipolar and anxiety disorders did not meet the Defendant's medical listings, and that most of her nonexertional functioning was not

significantly limited.  ®. 368-86).  Dr. Greene opined that Ms. Corcoran experienced only mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  ®. 378).  Accordingly, Dr. Greene concluded that Ms. Corcoran "retains the capacity to perform simple tasks from a mental standpoint."  ®. 380).

Additionally, Dr. Greene opined that the mental RFC assessment revealed that Ms. Corcoran was not significantly limited in fourteen of twenty categories of functioning, and only moderately limited in six categories ®. 383-84).  Accordingly, Dr. Greene concluded that Ms. Corcoran "retains the capacity to perform simple tasks from a mental standpoint."  ®. 384).

On January 25, 2005, Ms. Corcoran visited Dr. Joseph Sohn for bilateral leg pain, weakness, numbness and tingling.  ®. 398-99).  Dr. Sohn diagnosed Ms. Corcoran with "lumbar radiculitis" and sent her for a new MRI.  Id.  The MRI, taken on February 1, revealed a mild posterior disc protrusion at L5-S1, but showed no "evidence of neural impingement."  ®. 396-397).  Accordingly, when Ms. Corcoran returned to Dr. Sohn on February 10, Dr. Sohn stated that it was "difficult to correlate her leg pains and numbness and tingling with her lumbar spine."  ®. 396).

On January 28, Ms. Corcoran visited Shore Rehab at Denton, where she received physical therapy treatment.  ®. 387-95).  After January 28, she visited Shore Rehab only four more times.  Id.  At her last

visit on February 10, she indicated that while her "legs just ache all the time," her "back [was] better."  ®. 392; 400).

On July 19, Ms. Corcoran underwent her second set of Psychiatric Review Technique and mental RFC assessments.  ®. 427).  During the Psychiatric Review Technique assessment, Dr. Deborah Rose observed that the record evidenced three separate mental impairments under Listings 12.02, 12.04, and 12.06 with moderate limitations in three areas of functioning and one or two episodes of decompensation.  Id. Notwithstanding, Dr. Rose found that Ms. Corcoran failed to meet or equal any of those Listings.  Id.

Additionally, Dr. Rose opined that the mental RFC assessment revealed that Ms. Corcoran was not significantly limited in nine of twenty categories of functioning, and only moderately limited in ten categories of functioning.  ®. 431-32).  Accordingly, Dr. Rose concluded that Ms. Corcoran's "current mental functional capacity appears consistent with work."  ®. 433).

Nearly a year later, on May 12, 2006, Ms. Corcoran visited Dr. Thomas S. Lee, for neck and bilateral upper arm pain.  ®. 445-46). Dr. Lee's examination revealed that while Ms. Corcoran's "bilateral upper limb strength was intact," her "active cervical range of motion [was] 10 to 25% of normal," and her "wrist extension, finger flexion and interossei," were inhibited due to pain.  ®. 444-45).  Dr. Lee diagnosed "cervicalgia and bilateral upper limb pain status post fusion," and "cervical degenerative disc disease," and prescribed Lyrica and Ultram.  Id.

On June 7, Ms. Corcoran visited Memorial Hospital, where she complained of neck, left arm, and left shoulder pain. ®. 489). The attending doctor diagnosed her with cervical radiculopathy and treated her with prednisone. ®. 491; 497).

**Hearing Testimony ®. 500-56)**

On June 27, 2006, Ms. Corcoran appeared and testified at a hearing before ALJ Showalter. ®. 503-49). Vocational Expert Dr. James Ryan also testified. ®. 549-55).

First, ALJ Showalter questioned Ms. Corcoran about her employment history. ®. 502-13). Ms. Corcoran testified that she held three jobs in the last fifteen years. Id. From 1993-94, she worked as a secretary at a real estate firm, where her responsibilities included filing, making coffee, and answering the phones. ®. 511). From 1997-2003, she worked as a technology facilitator at an elementary school, where she supervised students using the computer lab. ®. 509-10). And, since October 2005, she has worked as a realtor, part-time. ®. 513).

The ALJ then questioned Ms. Corcoran about each of her physical ailments. ®. 513-26). As to her neck, Ms. Corcoran testified that she suffers constant pain, but that she had not received palliative treatment during the three months preceding the hearing. ®. 514-15). As to her left arm, she testified that her pain had grown increasingly worse over the last month and a half, that Ultram relieves her pain, but that she had not obtained Ultram during the three months preceding the hearing. ®. 518). As to her back, Ms. Corcoran testified that she suffers constant pain, rated 10 out of 10, but that she has not

seen a doctor for her pain since she visited the emergency room in 2005.  ®. 519-20).  As to her knee, she testified that she has only occasional problems.  ®. 521).  And, as to her right shoulder, she testified that she only has pain "every once in a while."  ®. 522).

Ms. Corcoran also indicated some occasional problems with her dexterity.  ®. 523).  She testified that she is generally able to hold a toothbrush, or knife and fork, but noted that she will occasionally drop things.  Id.  She also testified that while she can write, her handwriting has gotten worse, and that while she can type, she cannot hold the typing position.  ®. 524).  Finally, she testified that she is able to open her car door or a doorknob on her home without difficulty.  Id.

The ALJ also questioned Ms. Corcoran about her mental ailments. ®. 526-38).  Ms. Corcoran testified that while she experienced feelings of isolation, anxiety, and at one point considered harming herself, she had not taken her psychiatric medications for the five weeks preceding the hearing.  ®. 526-33).  She also testified that she had not seen a mental health professional in approximately four months.  ®. 526-28).

The ALJ then questioned Ms. Corcoran about her physical and mental abilities.  ®. 534-38).  Ms. Corcoran testified that she has difficulty standing and walking, and noted that she cannot walk for more than five minutes, stand for more than ten minutes, or climb stairs without difficulty.  (534-35).  She testified that she cannot sit comfortably for more than forty-five minutes, or lift more than a gallon of milk.  ®. 536).  Additionally, she cannot bend forward at

14

the waist, or kneel down without difficulty.  Id.  Lastly, she
testified that she has problems with her short term memory, and cited
her real estate exam, which she required three attempts to pass, as
evidence.  ®. 538).

    Finally, the ALJ questioned Ms. Corcoran about her daily
activities.  ®. 540-42).  Ms. Corcoran testified that while she still
cares for her personal hygiene, she no longer cleans her house.  ®.
540-41).  She also noted that she no longer cooks and can only make
sandwiches or use the microwave.  ®. 541).  However, in spite of her
ailments, Ms. Corcoran testified that she is able to run simple
errands, such as going to "the drugstore, the bank, the post office,
[and] the doctor," as well as occasionally going out to eat.  ®. 541-
42).

    On cross-examination, Ms. Corcoran clarified some of her
responses to the ALJ's questions.  ®. 543-49).  As to her dexterity,
Ms. Corcoran testified that she could not, "for eight hours a day,
five days a week, do something simple and repetitive with [her]
hands."  ®. 548-49).  As to her physical abilities, she testified that
in 2004, she attempted vocational rehabilitation at Three Doors, but
that she had "broke down" while there.  ®. 544).  As to her failure to
obtain her psychiatric medication, Ms. Corcoran testified that the
medication can cause her to speak without thinking.  ®. 545).  And
finally, as to her personal hygiene, Ms. Corcoran testified that it
takes her approximately two hours to shower and dress each morning.
®. 546-47).

The ALJ then examined Vocational Expert, Dr. James Ryan.  ®. 549-52).  Dr. Ryan first testified as to the exertional and skill levels of Ms. Corcoran's past relevant work.  ®. 550).  He classified her position as technology facilitator at the light exertional, semiskilled level, and her position as secretary at a real estate firm, at the sedentary, semiskilled level.  ®. 550-51).  However, he noted that because the skills from her position as technology facilitator were occupationally specific, they would not "transfer to a lower level of exertion."  Id.

Dr. Ryan then testified as to the work available for a hypothetical person, who at the date of onset was 34 years old, had a high school education, a work history like Ms. Corcoran's, could not perform more than simple unskilled work, could only occasionally climb or crawl, should never climb a ladder, rope or scaffold, could occasionally work overhead, could occasionally handle or finger, does not tolerate supervision, stress, or frequent contact with coworkers, and could not work at a production pace.  ®. 551-52).  He acknowledged that while such a person could not perform Ms. Corcoran's past relevant work, work could be found within the parameters of the hypothetical.  Id.  Specifically, Dr. Ryan identified light unskilled work as a machine tender, of which 62,000 jobs are available nationally, and 900 locally; quality control worker, of which 51,000 jobs are available nationally, and 700 locally; and packer, of which 47,000 jobs are available nationally, and 500 locally.  ®. 552).  He also identified sedentary unskilled work as an inspector, of which 69,000 jobs are available nationally, and 800 locally; laundry worker,

of which 49,000 jobs are available nationally, and 800 locally; and general clerical worker, of which 65,000 jobs are available nationally, and 1,000 locally.  Id.

On cross-examination, Dr. Ryan testified that the work he specified would have to be performed properly in order to avoid contact with a supervisor or co-workers.  (R. 554).  He also testified that a hypothetical person who could not maintain an eight hour a day, five day a week schedule, would not be able to perform unskilled, sedentary work on a full-time basis.  Id.

**ALJ Decision (R. 19-28)**

The ALJ concluded that Ms. Corcoran was not under a "disability," as defined in the Act and relevant regulations, during the closed period.  (R. 19).  The Act defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In evaluating plaintiff's claim for DIB, the ALJ followed the five-step process set forth in Section 14.1520 of the Code of Federal Regulations.  20 C.F.R. § 404.1520.  Under this Section, if it is determined that the plaintiff is or is not disabled at a step of the evaluation process, the evaluation ends.  Id. at § 404.1520(a)(4).

At the first step, the plaintiff must show that she has engaged in substantial gainful activity for the period of alleged disability. 20 C.F.R. § 404.1520(b).  Substantial gainful activity is work that

involves significant physical or mental activity usually for pay or profit. 20 C.F.R. §416.972(b).  The ALJ concluded that plaintiff has not engaged in substantial gainful activity since July 2, 2003.  ®. 21).  The ALJ noted that although, Ms. Corcoran "testified at the hearing that she obtained her real estate license in 2005 and works part-time in the real estate field," she alleges that she has not yet received any pay for this work.  Id.  Accordingly, her work "does not constitute substantial gainful activity."  Id.

At the second step, the plaintiff must demonstrate that she has an impairment or combination of impairments that is "severe."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c).  An impairment or combination of impairments is "severe" if it significantly limits the plaintiff's ability to perform basic work activities.  Id.  The ALJ concluded that plaintiff has the following severe impairments: cervical spine degenerative disc disease and depression.  Id.

At the third step, the plaintiff must establish that her impairment or combination thereof meets or equals the criteria of one of the impairments in the Listing of Impairments ("LOI"), found in 20 C.F.R. Part 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 404.1525, 404.1526.  If the plaintiff establishes that his or her impairment meets or equals the criteria of any impairment contained in the LOI, he is presumptively found to be disabled.  20 C.F.R. §§ 404.1520 (d).

The ALJ concluded that none of Ms. Corcoran's impairments met or equaled a listed impairment.  ®. 23).  The ALJ found that Ms. Corcoran's medical record failed to evidence nerve root compression or

arachnoiditis to the degree specified in sections 1.04A or 1.04B. ®. 23). Additionally, the ALJ found that Ms. Corcoran's medical record did not indicate that she was unable to ambulate effectively, as required by section 1.04C. Id.

As to section 12.04, the ALJ found that while Ms. Corcoran may have satisfied the "A" criterion, she did not satisfy the "B" or "C" criteria. Id. In making her determination, the ALJ specifically noted Ms. Corcoran's ability "to take care of her personal needs, prepare simple meals, drive for simple errands … do light household chores," "occasionally [go] out to eat," "accompany[y] her husband to the grocery store," "walk several times a week," "[get] her boys ready for school," "study for and pass her examination for a real estate license and work part-time in the real estate field." Id. Additionally, the ALJ noted that while Ms. Corcoran had testified that she has problems with concentration and memory, Dr. Seibert observed no significant defects in attention, concentration, or memory," Dr. Sahandy reported that she "displayed normal memory," and Dr. Schilder reported that "her attention span and concentration were normal." On these bases, the ALJ concluded that Ms. Corcoran "has only a mild restriction in activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence and pace." Id.

Before an ALJ advances to the fourth step, he or she must assess the plaintiff's "residual functional capacity" ("RFC"). 20 C.F.R. § 404.1520(a)(4), (e). RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work

setting on a regular and continuing basis.  S.S.R. 96-8p.  The ALJ

must consider even those impairments that are not "severe."  20 C.F.R.

§ 404.1520(a)(2).

> The ALJ made the following finding as to Ms. Corcoran's RFC:

> [C]laimant has the residual functional capacity to
> perform a range of sedentary work as defined at 20 C.F.R.
> 404.1567(a), with sitting 6 hours in an 8-hour workday,
> standing/walking 2 hours in an 8-hour workday, lifting 10
> pounds occasionally, and less than 10 pounds frequently,
> with only occasional climbing of ramps and stairs,
> occasional crawling, no climbing of ladders, ropes or
> scaffolds, and work that does not require constant overhead
> reaching or handling/fingering.  In addition, the plaintiff
> is limited to simple, unskilled work which is essentially
> isolated, with only occasional supervision, occasional
> contact with coworkers, and low stress, defined as only
> occasional changes in the work setting, and work which is
> not at a production pace.

®. 24).  In reaching this determination, the ALJ accorded greater

weight to Ms. Corcoran's medical record than to her hearing testimony.

®. 25).  She noted that while Ms. Corcoran's "impairments could

reasonably be expected to produce the alleged symptoms," they are "not

consistent with the severity alleged."  Id.  In support of her

position, the ALJ cited Exhibits 25F, in which Ms. Corcoran reported

"relief in her arm pain," 17F, a bone scan, which "was negative except

for degenerative changes in the ankles, knees, shoulders and cervical

spine," 21F, an MRI, which showed "no significant spinal stenosis,"

24F, a cervical spine X-ray, which "demonstrated satisfactory

alignment and a solid fusion," and 40F, in which Dr. Lee opined that

Ms. Corcoran's "cervical spine MRI revealed only mild abnormalities."

Id.  The ALJ also considered Exhibits 22F, in which the plaintiff was

described as "doing pretty well," 20F, in which Dr. Schilder "reported

a completely normal mental status examination," and 29F, in which "Dr.

Sahandy expressed the opinion … that, with treatment most of the plaintiff's psychiatric problems could be controlled."

At the fourth step, the ALJ must determine whether the plaintiff retains the RFC to perform his or her past relevant work ("PRW"); if so, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), (f).  In the instant case, the ALJ concluded that Ms. Corcoran was unable to perform any past relevant work.  Id. at § 404.1565; ®. 26).  She reasoned that Ms. Corcoran's "nonexertional limitations" prevented her from performing PRW, which the vocational expert had previously described as light and semiskilled and sedentary and semiskilled.  ®. 26).

If the plaintiff's RFC prevents him from performing his PRW, the burden shifts to the Commissioner at the fifth and final step.  Pass v. Charter, 65 F.3d 1200, 1203 (4th Cir. 1995); McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983).  At this step, the ALJ must show that the plaintiff is capable of performing other work which exists in significant numbers in the national economy, given the plaintiff's age, education, work experience, and RFC.  20 C.F.R. §§ 404.1520(a)(4)(v), (g), 404.1560(c), 404.1563, 404.1564, 404.1565, 404.1566.  If so, the plaintiff is not disabled.  Id. at § 404.1520(a)(4)(v).

The ALJ made the following preliminary findings: Ms. Corcoran was 34 years old on the alleged disability onset date ®. 26; 20 C.F.R. § 404.1563); she has at least a high school education, and she is able to communicate in English ®. 26; 20 C.F.R. § 404.1564); and, transferability of job skills is not material to the determination of

disability because the plaintiff is "not disabled."  ®. 26; 20 C.F.R. Part 404, Subpart P, Appendix 2).

The ALJ then concluded: "Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform."  ®. 27) (<u>citing</u> 20 C.F.R. §§ 404.1560(c), 404.1566)."  The ALJ noted that Ms. Corcoran's ability to perform the full range of sedentary work has been impeded by additional limitations.  <u>Id.</u>  To determine the extent to which these limitations eroded the unskilled light occupational base, the ALJ cited the VE testimony.  ®. 27).  The VE testified that given the plaintiff's age, education, work experience, and RFC, Ms. Corcoran would have been able to perform the requirements of representative unskilled, sedentary occupations such as inspector, of which 800 jobs exist locally; laundry worker, of which 800 jobs exist locally, and general clerical worker, of which 1000 jobs exist locally.  <u>Id.</u>

The ALJ therefore concluded that MS. Corcoran had not been under a disability from July 2, 2003 through the date of her decision.   ®. 27).

In assessing Ms. Corcoran's credibility, the ALJ recounted her hearing testimony.  ®. 24).  Ms. Corcoran testified that she experiences constant pain in her neck, head, and left arm, as well as occasional right shoulder pain.  <u>Id.</u>  She also testified that she could not raise her arms too far above her head and had occasional problems with fine dexterity.  Finally, she testified that she has had depressive symptoms since 1991, and noted that despite some

improvement with medication, she still has anxiety, fears, and
worries.  Id.

The ALJ concluded that "the plaintiff's medically determinable
impairment could reasonably be expected to produce the alleged
symptoms, but that [her] statements concerning the intensity,
persistence and limiting effects of these symptoms are not entirely
credible." ®. 25.)  The ALJ then went on to assess Ms. Corcoran's
RFC.  Id.

III.  Standard of Review

The findings of the Commissioner as to any fact, if supported by
substantial evidence, shall be conclusive.  42 U.S.C. § 405(g).  The
function of this Court is therefore not to try the plaintiff's claim
de novo, but rather to leave the findings of fact to the Commissioner.
Teague v. Califano, 560 F.2d 615, 618 (4th Cir. 1977).  Review by this
Court is limited to deciding whether, on the whole record, substantial
evidence supports the ALJ decision.  Id.  Substantial evidence is such
evidence that a reasonable mind would accept as sufficient to support
a conclusion.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).
It consists of more than a scintilla of evidence but may be somewhat
less than a preponderance.  Id.  The evidence must be sufficient to
justify a refusal to direct a verdict were the case before a jury.
Id.  A reviewing court thus may not re-weigh conflicting evidence,
make credibility determinations, or substitute its judgment for that
of the ALJ.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

If the ALJ decision is supported by substantial evidence, it is
immaterial whether the record as a whole might support an inconsistent

conclusion, or whether a reviewing court would have reached a contrary conclusion based upon the same evidence.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

However, a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  Judicial review of an ALJ decision therefore also requires a determination of whether the ALJ applied the correct legal standards.  Hays, 907 F.2d at 1456.

Finally, hearings on applications for DIB are not adversarial proceedings.  Easley v. Finch, 431 F.2d 1351, 1353 (4th Cir. 1970). Moreover, the Act is a remedial statute and is to be broadly construed and liberally applied in favor of beneficiaries.  Dorsey v. Bowen, 828 F.2d 246, 248 (4th Cir. 1987).  A claimant is entitled to a full and fair hearing, and the lack of such a hearing may constitute sufficient cause to remand.  Sims v. Harris, 631 F.2d 26, 27 (4th Cir. 1980).

This Court has the authority, upon the pleadings and transcript of the record, to enter a judgment affirming, modifying, or reversing the ALJ decision, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g).  A reviewing court may remand the ALJ decision (1) in conjunction with a judgment affirming, modifying, or reversing the decision, or (2) in light of additional evidence without a substantive ruling as to the correctness of the ALJ decision, provided that the claimant has shown good cause for failing to present the evidence earlier.  Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).

IV.  Discussion

Plaintiff argues that the ALJ's decision -- that the claimant was not under a disability from July 2, 2003, to September 12, 2006 -- is not supported by substantial evidence.  (Paper No. 17 at 26; R. 27.) In support of this argument, plaintiff raises four sub-arguments:

1) The ALJ's assessment of the medical evidence was flawed.

2) The ALJ failed to follow the special technique for evaluating mental impairments and erred in her mental RFC assessment.

3) The ALJ failed to properly evaluate plaintiff's pain.

4) The ALJ failed to properly consider all of plaintiff's impairments and their combined effect on her ability to work.

(Paper No. 17 at 28.)  For the reasons below, the Court rejects each of these sub-arguments.  Consequently, the Court concludes that the ALJ's decision is supported by substantial evidence.

A.  The ALJ Properly Assessed the Medical Evidence

Plaintiff first argues that the ALJ's assessment of the medical evidence was flawed.  (Paper No. 17 at 28.)  Plaintiff presents a number of reasons in support of this claim.  The Court will address each of these reasons separately in rejecting the argument.

1.  Evidence Related to the Claimant's Alleged Mental Impairments

Plaintiff argues that the ALJ "relied heavily" on Dr. Siebert's psychiatric evaluation of plaintiff despite the fact that it took place before the alleged disability onset.  (Paper No. 17 at 28.)  Dr. Siebert evaluated plaintiff on October 17, 2002 -- about eight and one-half months before the alleged disability onset of July 2, 2003 -- and on June 2, 2003 -- one month before.  (R. 164.)  Dr. Siebert's report was based on both evaluations.  See id.

First, the Court concludes that the ALJ's consideration of the report was proper.  The ALJ is required to "consider all evidence in [the claimant's] case record when [making] a determination or decision whether [the claimant] is disabled."  20 C.F.R. § 404.1520(a)(3); Stemple v. Astrue, 475 F.Supp.2d 527, 534 (D. Md. 2007); see also 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive").  Other Circuits have explicitly held that the ALJ may, and sometimes must, consider medical evidence which predates the alleged onset of disability.  See, e.g., Carpenter v. Astrue, 2008 WL 3892065, at *2 (10th Cir. 2008) (holding that the ALJ's failure to consider medical evidence predating the claimant's alleged onset of disability was reversible error) (citing 20 C.F.R. § 404.1520(a)(3)); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) ("there is no valid reason to exclude consideration of medical records dated prior to [the claimant's] alleged date of onset").

Furthermore, in assessing functional limitations, the ALJ must consider "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation."  20 C.F.R. § 404.1520a(c)(1); see also Moses v. Chater, No. SKG-96-1770, slip op. at 14 (D. Md. 1997) ("The ALJ must consider all the relevant evidence") (citing Arnold v. Sec'y of Health, Educ. and Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  The Court notes that Dr. Siebert's report is more probative than plaintiff suggests.  Plaintiff points out that the second evaluation occurred "nearly a year prior to the date of Ms. Corcoran's application [for DIB]."  (Paper No. 17 at 29.)  But it is the date of the alleged disability onset (July 2, 2003) that

26

is the key date of reference, not the date of plaintiff's application for DIB (April 24, 2004).  Because Dr. Siebert's second evaluation occurred just one month before the alleged onset date, the Court concludes that the ALJ did not err in giving it some weight.[1]

The Court also concludes that plaintiff has overstated the degree to which the ALJ relied on Dr. Siebert's report.  As indicated above, the ALJ cited the report several times in her decision.  At Step 2, the ALJ cited the report in support of her finding that plaintiff's depression was a severe impairment under 20 C.F.R. § 404.1520(c).  ®. 22.)  This citation was part of a chronological analysis of pertinent mental health evidence, beginning in March 1999 and continuing through December 2005.  Id.  Thus, Dr. Siebert's report was only one of seven exhibits relied on by the ALJ in support of her finding at Step 2.

The ALJ appeared to rely on Dr. Siebert's report most heavily at Step 3.  (See R. 23-24.)  However, the ALJ also relied on four other exhibits or testimonial statements at this step, and each pertained to plaintiff's condition after the alleged onset date.  Id. Specifically, the ALJ relied on Exhibit 29F -- D.D.S. Dr. Sahandy's report following his November 2004 examination of plaintiff; Exhibit 22F -- medical records from Dr. Bautista dated through December 2003; Exhibit 20F -- Dr. Schilder's report following his July 2003 examination of plaintiff; and Ms. Corcoran's own testimony from the hearing.  Id.

---

[1] Plaintiff also suggests that, because Dr. Siebert based his report on two evaluations of plaintiff (October 17, 2002, and June 2, 2003), the latter is "a near duplication" of the first evaluation.  (Paper No. 17 at 29 n. 32.)  Plaintiff has presented no evidence in support of this suggestion.  Moreover, Dr. Siebert's report makes several references to treatment that occurred in early 2003.  (See, e.g., R. 165-66.)

The ALJ also cited the report in support of her determination of plaintiff's RFC.  ®. 25-26.)  But the ALJ cited at least 16 other exhibits or testimonial statements in making this finding.  Id.

In conclusion, the ALJ properly relied upon Dr. Siebert's report, as well as numerous other medical records and findings.

### 2.  The ALJ Properly Assessed the Severity of the Claimant's Mental Impairments

Plaintiff next argues that

the ALJ decision neglected to cite all of Ms. Corcoran's
mental impairments at step 2 of the sequential evaluation
process, noting only depression instead of the mental
impairments noted by Defendant's own medical consultants who
determined that she suffered from 3 distinct mental
impairments, viz. ADHD and learning disabilities by history,
bipolar disorder mixed, and an anxiety disorder[.]

(Paper No. 17 at 30) (citing R. 417-22).  The Court rejects this argument.  First, plaintiff is wrong that the ALJ "neglected to cite all of Ms. Corcoran's mental impairments at step 2" and that she only noted the claimant's depression.  (See R. 22.)  The ALJ in fact noted all of the mental impairments that defendant has pointed to:

· An initial psychiatric evaluation report dated October 20,
2000 reflects diagnoses of generalized anxiety disorder and
dysthymic disorder.  ®. 152-54.)

· Stephen W. Siebert, M.D., . . . reported that the claimant
was diagnosed with a bipolar disorder after experiencing a
manic episode in the summer of 2001. . . .  His diagnostic
impression was depressive disorder, NOS, and bipolar
disorder, in remission.  ®. 163-69.)

· In a letter dated October 15, 2003, Dr. Bautista wrote to
the claimant's school that [plaintiff] was being treated for
bipolar I disorder and [ADHD].  ®. 271.)

· Parviz Sahandy, M.D., who performed a consultative
psychiatric exam in November 2004, reported diagnoses of
bipolar disorder, mixed, ADHD and learning disabilities by
history, anxiety and a few panic episodes.  ®. 417-22.)

®. 22) (emphases added).  Thus, the ALJ noted each mental impairment that plaintiff alleges the ALJ "neglected to cite"; cited the specific exhibit plaintiff has cited in making this assertion ®. 417-22); and cited other diagnoses of the disputed mental impairments.  Plaintiff may have meant to argue that the ALJ failed to separately (as opposed to collectively) evaluate the severity of plaintiff's alleged depression, ADHD, learning disability, bipolar disorder, and anxiety disorder.  But this is precisely what the ALJ is charged with doing.  See S.S.R. 85-28 ("[W]hen assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone").

At the second step, the claimant must demonstrate that she has an impairment or combination of impairments that is "severe."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c); Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987) (stating that the claimant bears the burden of showing that he has a "severe" impairment).  An impairment or combination thereof is "severe" if it significantly limits the claimant's ability to perform basic work activities.  Id.  This step is not satisfied "when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs."  S.S.R. 85-28.

Apart from the fact of diagnoses, plaintiff has pointed to no evidence that the disputed mental impairments are severe.  "The law is clear," though, "that a mere diagnosis says nothing about the severity

of the condition." <u>Gowans v. Astrue</u>, No. SKG-06-2817 (D. Md. 2008)

(<u>citing</u> <u>Higgs v. Bowen</u>, 880 F.2d 860, 863 (6th Cir. 1988)) (internal

quotation marks omitted); <u>Scull v. Apfel</u>, 221 F.3d 1352, *1 (10th Cir.

2000) ("[t]he mere diagnosis of arthritis, of course, says nothing

about the severity of the condition. . . .  We have on a number of

occasions recognized this dispositive gap between diagnostic evidence

per se and the requisite showing of consequent impairment") (internal

citations omitted).  Nor has the Court found any medical opinion in

the record to the effect that plaintiff's ADHD, bipolar disorder, or

anxiety disorder "significantly limit[ed] the claimant's ability to

perform basic work activities."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c).[2]

### 3.  Evidence Related to the Claimant's Cervical Spine Impairment

#### a.  Dr. Hardy's Report of May 8, 2000

Plaintiff also submits that the ALJ "relied heavily" on medical

evidence of the claimant's cervical spine impairment, and that such

reliance was improper.  (<u>See</u> Paper No. 17 at 30.)  For the reasons

discussed below, the Court rejects this argument.

In support of this claim, plaintiff points out that, at Step 2,

the ALJ "note[d] a report by Dr. Hardy dated May 8, 2000 which showed

limited lumbar motion, but improvement in symptoms."  (<u>Id.</u>; R. 22.)

Plaintiff argues that the ALJ's citation of this report

---

[2] Moreover, even if the Court were to conclude that the ALJ should have
found the other mental impairments to be severe, such an error would
appear to be harmless.  Depression, anxiety, and bipolar disorder
contain identical B and C criteria.  <u>See</u> Listings 12.04 and 12.06.
Thus, the ALJ's finding that plaintiff's depression did not satisfy
the B and C criteria of Listing 12.04 is tantamount to a finding that
her bipolar disorder and anxiety disorder did not meet the B and C
criteria of Listing 12.06.  (<u>See also</u> Paper No. 22 at 18 n. 10.)

"demonstrate[s] a clear failure to evaluate relevant medical evidence during the applicable period of time" because the report predated the alleged onset date by more than three years.  (Paper No. 17 at 30.)

However, plaintiff has conflated two portions of the ALJ's decision.  The ALJ referenced Dr. Hardy's report in analyzing the severity of the claimant's "low back and bilateral lower extremity pain," not her cervical spine impairment.  ®. 22.)  Thus, the ALJ's citation of this report says nothing about whether the ALJ properly evaluated the medical evidence of the cervical spine impairment.

With respect to the claimant's "low back and bilateral lower extremity pain," the Court notes that the ALJ cited Dr. Hardy's opinion only as part of a chronological analysis of the claimant's treatment for this impairment.  Indeed, the ALJ went on to note that "[t]he record is silent as to any further treatment for lower back pain until January 2005, at which time the claimant was evaluated by Joseph M. Sohn, M.D.[.]" ®. 22) (citing R. 396-99.)  After citing another report from Dr. Sohn dated February 2005, the ALJ noted that "[t]here are no further treatment records after this date with regard to the claimant's lower back or leg pain." ®. 22.)  Thus, there is no medical evidence (during the closed period) showing impairment of the claimant's lower back or legs before or after early 2005.  Even if the ALJ had found this impairment to be severe, there is no medical evidence of record that the claimant "ha[d] a severe . . . impairment [or combination thereof] that meets the duration requirement in § 404.1509 [12 months][.]"  20 C.F.R. S 404.1520(a)(4)(ii).

                    b.  The Claimant's Three Cervical Fusions

Plaintiff also argues that "the ALJ decision seems to minimize the fact that Ms. Corcoran underwent 3 separate extensive and complex cervical fusions involving instrumentation, stating that the first ended with good results, noting only that she had the second on 9/11/01 and the third on 12/29/03 to repair a pseudoarthrosis." (Paper No. 17 at 31; R. 21-22.)

The ALJ cited each cervical fusion at Step 2. (R. 21-22.)  The ALJ went on to discuss the results of a November 2003 MRI, as well as the May 2006 diagnoses of Dr. Lee.  Id.  Plaintiff has not identified what additional information the ALJ should have discussed with respect to the claimant's three cervical fusions.[3]  Furthermore, even if the ALJ did "minimize" these procedures, the ALJ ultimately concluded that the claimant's cervical spine impairment was severe. (R. 22.)

### c.  The Claimant's Hospitalizations at Shore Health Systems for Complaints of Cervical Spine Problems

Plaintiff next argues that "[c]ompletely absent from the decision is any mention of Ms. Corcoran's *numerous* visits to the Shore Health System emergency room with complaints of ongoing cervical spine problems." (Paper No. 17 at 31) (emphasis added).  The Court notes at the outset that plaintiff appears to have visited Shore only twice with complaints of ongoing cervical spine problems.

The claimant was treated at Shore in March 2004 with complaints of a headache, tingling on the left side of her face, left arm pain, and nausea. (R. 337-47.)  The physician noted that the claimant was in

---

[3] *See, e.g.*, Whittaker v. Astrue, No. SKG-07-3242, slip op. at 12 (D. Md. 2009) (rejecting argument that the ALJ failed to consider two alleged impairments in part because plaintiff "fail[ed] to bolster that claim with any discussion, analysis, or argument").

only moderate distress and that her pain was relieved two hours after the claimant's arrival. ®. 340.) A CT scan of the brain was "normal" ®. 345), and an imaging of the cervical spine revealed "no change compared to previous study done December 30, 2003" ®. 346). The Court concludes that the ALJ should have cited this exhibit, but failure to do so was harmless error.[4] The ALJ cited several other nearly contemporaneous pieces of medical evidence. For example, the ALJ noted the December 2003 X-ray, which "demonstrated satisfactory alignment and a solid fusion," Id. (citing R. 325), as well as the March 2004 MRI evaluated by Dr. Lee, which showed only "mild abnormalities." ®. 25 (citing R. 446)). The ALJ also discussed the observations of Dr. Knox, who found in February 2004 that the claimant still experienced neck pain after her final surgery but experienced relief in her arm pain. ®. 25 (citing R. 332-33)). Even if the March 2004 hospitalization is indicative of a greater intensity of impairment than found by the ALJ, this does not undercut the ALJ's finding that the claimant's statements concerning the *persistence* of her symptoms were not entirely credible. Further, as defendant points out, the ALJ ultimately credited the claimant's March 2004 complaints of pain in the RFC. (See R. 24 (limiting the claimant to work that is simple; unskilled; does not require lifting more than 10 pounds; and does not require constant overhead reaching or handling /fingering).)

---

[4] See, e.g., Underwood v. Astrue, 2008 WL 4547820, *21 (W.D. Va. 2008) (holding that "[the ALJ's] failure to thoroughly discuss [a particular exhibit in the record] constitutes harmless error at best, as it did not prohibit this court from determining whether the ALJ's findings were supported by substantial evidence") (citing Camp v. Massanari, 2001 WL 1658913, *1 (4th Cir. 2001)).

The claimant was also treated at Shore in June 2006 for pain in her neck, left shoulder, and left arm. ®. 483.) However, plaintiff does not point to any medical findings from this visit. The most significant finding appears to be that the claimant was in "mild" distress and had only "moderate" pain. ®. 496-97.) The Court concludes that the ALJ should have cited this exhibit, but failure to do so was harmless error, as discussed above regarding the March 2004 hospitalization.[5] The Court also notes that the ALJ ultimately found plaintiff's cervical spine impairment to be severe at Step 2.

### d. Dr. Shepard's Report of August 2002

Plaintiff also alleges that the ALJ should have discussed the report of Dr. Shepard, who opined in August 2002 that the claimant had a 70 percent disability to her cervical spine. (Paper No. 17 at 31; R. 204.) However, Dr. Shepard gave this opinion almost a year prior to the date of alleged disability onset (July 2003), and more than a year prior to corrective surgery performed on the claimant's cervical spine (December 2003).[6] As discussed above, the ALJ referenced the more recent and relevant evidence of the claimant's cervical spine

---

[5] Furthermore, it is well settled that "[a]n ALJ is not required to comment on every piece of evidence in the record." Whittaker v. Astrue, No. SKG-07-3242, slip op. at 12 (D. Md. 2009); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Wall v. Astrue, 561 F.3d 1048, 1067 (10th Cir. 2009); 224 Fed.Appx. 574, 578 (9th Cir. 2007); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). In addition, an ALJ's failure to cite a specific piece of evidence is not an indication that the evidence was not considered. Whittaker, No. SKG-07-3242 at 12; Black, 143 F.3d at 386.

[6] As defendant points out, this argument undermines plaintiff's previous argument that the ALJ should not have considered Dr. Seibert's report because it predated the onset date by one month.

impairment.  Moreover, the ALJ ultimately found that the claimant's

cervical spine degenerative disc disease was severe.  ®. 21-22.)

### e.  Dr. Lee's Assessment of May 2006

Plaintiff also argues that the ALJ mischaracterized Dr. Lee's May

2006 assessment with respect to the claimant's extremity strength,

diagnostic evidence, and subjective pain reports.  (Paper No. 17 at

31-32.)  The following excerpts from the ALJ decision are pertinent:

> A cervical spine MRI performed in November 2003
> demonstrated mild left uncovertebral joint hypertrophy
> leading to minimal impingement of the ventral thecal sac at
> C3-4 and minimal left uncovertebral joint hypertrophy at C6-
> 7.  [Dr. Lee] reported on May 12, 2006 that the claimant had
> cervicalgia and bilateral upper limb pain status post fusion
> as well as cervical degenerative disc disease.  ®. 22 (Step
> 2) (citing R. 445-56).)

> A cervical spine X-ray obtained on December 30, 2003,
> demonstrated satisfactory alignment and a solid fusion.  ®.
> 335.)  Dr. Lee reported on May 12, 2006, that the claimant
> was in "mild distress secondary to pain."  Dr. Lee found
> diffuse tenderness in the cervical spine.  However, he
> reported that the claimant's bilateral upper extremity
> strength was essentially intact.  According to Dr. Lee, the
> cervical spine MRI revealed only mild abnormalities.  ®. 25
> (RFC assessment) (citing R. 445-446.)

> [T]he claimant's chronic neck pain and restricted
> cervical range of motion as well as her history of cervical
> fusions . . . limits her exertional abilities.  In addition,
> considering the claimant's upper extremity pain and diffuse
> tenderness, and history of pseudoarthritic repair, it is
> reasonable to further limit the claimant to no constant
> overhead reaching, fingering or handling.  ®. 26 (RFC
> assessment).)

First, plaintiff avers that, in stating that Dr. Lee found that

the claimant's bilateral upper extremity strength was "essentially

intact," the ALJ erred by not "completing the rest of the sentence."

(Paper No. 17 at 32.)  Dr. Lee had opined that the claimant's

"bilateral upper limb strength is intact except inhibited wrist

extension, finger flexion and interossei secondary to pain." (R. 446.)
However, the Court agrees with defendant that the ALJ did not
represent that the claimant's limb strength was completely intact.
Indeed, the ALJ ultimately found the claimant's cervical spine
impairment (which causes the alleged restrictions in her arms) to be
severe. (R. 21-22.)  Further, the ALJ concluded, "considering the
claimant's upper extremity pain and diffuse tenderness, and history of
pseudoarthritic repair, it is reasonable to further limit the claimant
to no constant overhead reaching, fingering or handling. (R. 26.)

Next, plaintiff appears to argue that the ALJ, in stating that
"according to Dr. Lee, the cervical spine MRI revealed only mild
abnormalities," erred by giving exclusive consideration to the
November 2003 MRI, and not considering the March 2004 X-rays. (Paper
No. 17 at 32; R. 25, 446.)  It is true that the ALJ never explicitly
references the March 2004 X-rays.  However, the ALJ gave considerable
weight to Dr. Lee's 2006 report, and Dr. Lee explicitly relied on the
March 2004 X-rays in arriving at his conclusions. (See R. 446.)  In
finding (based on Dr. Lee's report) that the claimant had cervicalgia
and bilateral upper limb pain post fusion; cervical degenerative disc
disease; mild distress secondary to pain; diffuse tenderness in the
cervical spine; essentially intact bilateral upper extremity strength;
and only mild abnormalities in the cervical spine; therefore, the ALJ
gave indirect weight to the March 2004 X-rays.[7]  Moreover, the Court
agrees with defendant that both the November 2003 MRI and the March

_____

[7] See, e.g., Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)
(finding harmless error where, "although the ALJ did not explicitly
consider [plaintiff's] obesity, it was factored indirectly into the
ALJ's decision as part of the doctor's opinions").

2004 X-rays showed only mild abnormalities.  In addition, the Court again notes that the ALJ ultimately afforded weight to Dr. Lee's assessments of cervicalgia and bilateral upper limb pain status post fusion and cervical degenerative disc disease (all of which were informed by the November 2003 MRI and March 2004 X-rays) in finding that the claimant's cervical spine impairment was severe.  ®. 21-22.)

Finally, plaintiff argues that "[no] mention is made by the ALJ that Ms. Corcoran's pain level at the time of her visit to Dr. Lee was 9 out of 10." (Paper No. 17 at 32 (<u>citing</u> R. 445).)  See the Court's discussion about the ALJ's evaluation of the claimant's subjective complaints of pain, <u>infra</u> at § IV-C, for a complete discussion of this claim.  The Court also notes that, although the claimant reported to Dr. Lee that her pain level was "9 out of 10," the ALJ noted that Dr. Lee only observed that she was "in some mild distress secondary to pain" on the same date.  ®. 25 (<u>citing</u> R. 445-46.)

### 4.  Evidence Related to the Claimant's Knee Problems

Plaintiff argues that the ALJ should have discussed the arthroscopic surgery performed in May 1996 to repair a torn meniscus in the claimant's left knee, as well as Dr. Shepard's August 2002 opinion that that the claimant had a 20 percent impairment to her left knee. (Paper No. 17 at 31.)  However, the surgery was performed seven years before the claimant's alleged onset date.  Moreover, the record appears to indicate that the claimant worked continuously from 1992 to 2003. (<u>See</u> R. 82.)  Further, the record contains no treatment notes subsequent to the surgery regarding the claimant's knee.  Nor does plaintiff point to any evidence of record indicating that her knee

limited her in any way during the closed period.  Moreover, in her

application and follow-up papers submitted to the Administration, the

claimant never alleged that her knee prevented her from working or

caused any limitations.[8]  ®. 71, 97.)  Finally, at the hearing, the

claimant discussed her knee only in response to questions from the

ALJ.  ®. 520-21.)  Specifically, the claimant testified that her knee

"occasionally bothers [her]" by becoming "swelled up at times."  ®.

521.)  When the ALJ asked the claimant whether it was a daily problem,

the claimant said that swelling occurred "once every two weeks maybe"

but that "it's hard to tell with that one."  ®. 521.)  Whether or not

it was error for the ALJ to decline to discuss the claimant's alleged

knee impairment, failure to do so was no more than harmless error.

 B.  The ALJ Properly Evaluated the Claimant's Mental Impairments

    The five-step process outline in 20 C.F.R. § 404.1520 applies to

the evaluation of both physical and mental impairments.  20 C.F.R. §§

404.1520a, 416.920a.  When the ALJ evaluates a mental impairment, the

ALJ must also follow the special technique outlined in 20 C.F.R. §§

404.1520a, 416.920a.  Id.  This regulatory scheme identifies four

broad functional areas in which the ALJ is to rate the degree of

---

[8] See, e.g., Whittaker, No. SKG-07-3242, slip op. at 11 (D. Md. 2009)
("Quite simply, [there is no] evidence suggesting that [plaintiff]
obesity exacerbated any of her health problems.  There is no evidence
that she ever argued or alleged that her weight contributed to
disabilities.  None of her physicians ever indicated that her obesity
caused her pain, restricted her mobility, or otherwise rendered her
unable to work.  Thus, except for a few recordings of [the claimant's]
weight, BMI and one mention of obesity, there was no evidence for the
ALJ to evaluate.  To have concluded that her obesity contributed to
her disability would have been speculative[.]")  Moreover, the Court
concludes that the evidence concerning the claimant's alleged knee
impairment is not "relevant" under 20 C.F.R. § 404.1520a(c)(1).

functional limitation resulting from a claimant's mental impairment: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id. at § 404.1520a(c)(3).  The ALJ's decision must incorporate the pertinent findings and conclusions based on the special technique.  Id. at § 404.1520a(e)(2).  The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  Id.

### 1.  Step 3 of the Sequential Evaluation Process

Plaintiff argues that the ALJ failed to follow this technique at Step 3.  (Paper No. 17 at 35-36.)  Once the ALJ has determined that the claimant has a severe mental impairment, Section (d)(2) of the special technique directs the ALJ to "determine if it meets or is equivalent in severity to a listed mental disorder," in accordance with 20 C.F.R. § 404.1520(d).  20 C.F.R. § 404.1520a(d)(2).

Plaintiff argued that the claimant met Listing 12.04 (Affective Disorders).  ®. 23.)  The ALJ found that the claimant did not satisfy the B or C criteria, however, because she had only mild restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.[9]  Id.

---

[9] The B criteria of Listing 12.04 require the claimant to have at least two of: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Pt. 404, Subpt. P, App. 1, Listing 12.04.

Specifically, plaintiff first argues that the ALJ failed to cite the July 19, 2005, Psychiatric Review Technique Form completed by Dr. Rose, who opined that the claimant's mental impairments resulted in *moderate* restrictions of activities of daily living; *moderate* difficulties in maintaining social functioning; *moderate* difficulties in maintaining concentration, persistence, or pace; and *one or two* episodes of decompensation.[10]   (Paper No. 17 at 35; R. 427.)   While the ALJ did not specifically mention or incorporate Dr. Rose's opinion, doing so would not have changed her finding that the claimant did not meet the B criteria of Listing 12.04 (or of Listings 12.02 or 12.06); Dr. Rose's ratings did not satisfy the B criteria.   With respect to the C criteria of Listing 12.04, Dr. Rose explicitly indicated that the claimant did not satisfy them.   (®. 428.)

Second, plaintiff argues that it was error for the ALJ to rely on the opinion of Dr. Seibert because his evaluative report predated the claimant's date of alleged onset date by one month.   (Paper No. 17 at 35.)   As discussed, <u>supra</u> at § IV-A(1), this argument fails.

### 2.   RFC Assessment

Plaintiff also argues that the ALJ failed to follow the special technique in evaluating the claimant's RFC.   (<u>See</u> Paper No. 17 at 36.) Under the special technique, if the ALJ finds that the claimant has a severe mental impairment that does not meet a Listing, the ALJ must

---

[10] Dr. Rose explicitly stated that her opinion applied to Listings 12.02, 12.04, and 12.06.   (®. 427.)   These listings have identical B criteria.   Pt. 404, Subpt. P, App. 1, Listings 12.02, 12.04, 12.06.

then assess the claimant's RFC, in accordance with 20 C.F.R. §
404.1520(e).  20 C.F.R. § 404.1520a(d)(3).

Specifically, plaintiff argues that it was error for the ALJ to
cite the Mental RFC Assessment of December 2004 but not the Mental RFC
Assessment of July 2005.  (Paper No. 17 at 36.)  The Court concludes
that the ALJ should have cited the July 2005 Assessment, but failure
to cite that Assessment was harmless error because it is consistent
with the earlier Assessment and with the ALJ's RFC finding.

The only notable difference between the December 2004 Assessment
and the July 2005 Assessment is that in the latter, Dr. Rose concluded
that the claimant experienced moderate limitations in a greater number
of areas (four) than found in the earlier Assessment (See R. 383-384;
431-32.)  The earlier Assessment concluded that the claimant "retains
the capacity to perform simple tasks from a mental standpoint."  ®.
385.)  Similarly, the latter Assessment concluded that the claimant
"demonstrates some areas of moderate limitation relating to continued
concentration, persistence and pace, social interactions and
adaptation . . .  Overall, however, the claimant's current mental
functional capacity appears consistent with work."  ®. 433.)

More importantly, the ALJ's finding as to the claimant's RFC is
consistent with the July 2005 Assessment.  The ALJ concluded that the
claimant was limited to "simple, unskilled work which is essentially
isolated, with only occasional supervision, occasional contact with
coworkers, and low stress, defined as only occasional changes in the
work setting, and work which his not at a production pace."  ®. 24.)
This finding accords with Dr. Rose's conclusion in July 2005, above.

See, e.g., Underwood v. Astrue, 2008 WL 4547820, *21 (W.D. Va. 2008) (holding that "[the ALJ's] failure to thoroughly discuss the July 29, 2005, PRTF constitutes harmless error at best, as it did not prohibit this court from determining whether the ALJ's findings were supported by substantial evidence") (citing Camp v. Massanari, 2001 WL 1658913, *1 (4th Cir. 2001)).  Thus, the ALJ's failure to discuss the July 2005 Assessment would not have affected her finding as to RFC.

In short, the undersigned agrees with the ALJ's conclusions even if the ALJ did not perfectly discuss and review all possible relevant evidence in this complicated medical history.  "The Court's review of the record has demonstrated the correctness of the ALJ's decision, and a remand for the ALJ's explication would be futile." Williams v. Halter, No. SKG-00-871    , slip op. at 28 (D. Md. 2001), (citing Lively v. Bowen, 858 F.2d 177, 182 (4th Cir. 1988)); see also Barry v. Bowen, 862 F.2d 869, *2 (4th Cir. 1988) ("To remand on this point where there is not the slightest uncertainty as to the outcome of the remand would be an idle and useless formality," in a Social Security appeal) (per curiam).

### 3.  Hypothetical Question Posed to the VE[11]

Plaintiff next argues that the ALJ's hypothetical question to the VE should have included additional limitations that were included in the July 2005 Mental RFC Assessment.  (Paper No. 17 at 35-36.)  As discussed in the previous section, the Court concludes that the ALJ

_____

[11] The Court points out that it is the five-step process outlined in 20 C.F.R. § 404.1520 that requires the ALJ to pose a proper hypothetical question to the VE, not the special technique outlined in 20 C.F.R. § 404.1520a.  Nevertheless, the Court will discuss this argument within the special technique section in accordance with plaintiff's brief.

should have referenced the July 2005 Mental RFC Assessment, but her failure to do so did not render the hypothetical erroneous.

In deciding whether the Commissioner has met his burden at Step 5, the ALJ generally must accept evidence from a VE, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy. Morgan v. Barnhart, 142 Fed. Appx. 716, 720 (4th Cir. 2003); see also 20 C.F.R. § 404.1520(g)(1). The Commissioner can show that the claimant is not disabled only if the VE's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.1989) For a VE's opinion to be relevant or helpful, it must be based on a consideration of all other evidence and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Walker, 889 F.2d at 50.

Specifically, plaintiff argues that the ALJ's question to the VE should have included moderate limitations in the following areas: (1) the ability to maintain regular attendance and be punctual within customary tolerances; (2) the ability to make simple work-related decisions; (3) the ability to complete a normal workday or work week due to psychologically based symptoms; and (4) the ability to accept instructions and respond appropriately to criticism from supervisors. (Paper No. 17 at 37; R. 432-32.) However, each of those functions falls within larger categories of functional abilities on the Mental RFC Assessment. (See R. 431-32.) The ALJ properly addressed each of those larger categories in the hypothetical posed to the ALJ.

For instance, the ability to maintain regular attendance and be punctual within customary tolerances, and the ability to complete a normal workday or work week without interruptions from psychologically based symptoms, both fall under the category "sustained concentration and persistence." ®. 431.)  The ALJ properly addressed this category in her hypothetical by describing work that is "not at a production pace," is characterized as "low stress," is simple and unskilled, and that requires "only occasional changes in the work setting."  ®. 551.)  Furthermore, the ability to accept instructions and respond appropriately to criticism from supervisors falls under the category "social interaction."  ®. 432.)  In the question to the VE, the ALJ addressed this category by limiting the claimant to work that was "essentially isolated" with "only occasional supervision" and "only occasional contact with coworkers."  ®. 551.)  The VE added that such a person "would not see the supervisor very often" and that "these jobs would be primarily performed in isolation.  They do not require teamwork or communication with another individual[.]"  ®. 553.)

The Court concludes, therefore, that even if the ALJ did not incorporate the July 2005 Mental RFC Assessment into the hypothetical, the failure to do so was harmless error.  See, e.g., English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993) (rejecting claimant's argument that "the hypothetical posed to [the VE] was inadequate in that it did not incorporate all pertinent information as to [claimant's] disabilities" because "the question presented could be viewed as presenting" such pertinent information) (remanded on other grounds).  This conclusion follows from the Court's analysis in the

previous section, in which the Court concluded that the December 2004 Assessment and the July 2005 Assessment are substantially similar.[12]

> C.  The ALJ Properly Evaluated the Intensity and Persistence of the Claimant's Alleged Pain and Other Symptoms

Plaintiff next argues that the ALJ failed to properly evaluate her pain.  (Paper No. 17 at 38-40.)  The Court concludes, however, that the ALJ properly evaluated the claimant's pain.

Under Craig v. Chater, 76 F.3d 585, 594-95 (4th Cir. 1996), the ALJ must employ a two-part test in addressing a disability claimant's subjective symptoms.  First, the ALJ examines whether the "claimant has met [her] threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed."  Id. at 595.  In the instant case, the ALJ found that, during the closed period, "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms[.]"  ®. 25.)  Thus, Ms. Corcoran met the first step.

At the second step, the ALJ must evaluate "the intensity and persistence of the claimant's pain" and "the extent to which it affects [her] ability to work."  20 C.F.R. § 1529(c)(1); Craig, 76 F.3d at 95.  In making this evaluation, the ALJ must consider all of the available evidence.  20 C.F.R. §§ 1527, 1529(c)(1).  Factors to be considered by the ALJ include: (1) the claimant's own statements about her pain; (2) medical history; (3) laboratory findings; (4) objective medical evidence of pain; (5) daily activities; and (6) treatment to

---

[12] Also, plaintiff acknowledges that the ALJ likely used the December 2004 Mental RFC Assessment -- which the Court has concluded was substantially similar to the July 2005 Assessment -- in constructing her hypothetical question to the VE.  (See Paper No. 17 at 36.)

alleviate pain.  Craig, 76 F.3d at 595; 20 C.F.R. § 416.1529(c).  But
the ALJ need not accept the claimant's allegations about her pain to
the extent that they are inconsistent with the rest of the evidence.
Craig, 76 F.3d at 595.  Finally, it is not sufficient for the ALJ "to
make a single, conclusory statement" that the claimant's allegations
are not credible.  S.S.R. 96-7p.  Rather, the determination "must
contain specific reasons for the finding on credibility, supported by
the evidence . . . and must be sufficiently specific to make clear to
the individual and to any subsequent reviewers the weight [given] to
the individual's statements and the reasons for that weight."  Id.

　　In the instant case, the ALJ concluded that "the claimant's
statements concerning the intensity, persistence and limiting effects
of these symptoms are not entirely credible."  ®. 25.)

　　With respect to the claimant's cervical spine impairment, the ALJ
explained that "the record does not disclose significant or persistent
findings consistent with the claimant's allegations of disabling
pain."  ®. 25.)  Specifically, the ALJ stated that "objective studies
have revealed minimal findings which are inconsistent with the
claimant's subjective allegations."  Id.  For example, the ALJ noted
the December 2003 X-ray, which "demonstrated satisfactory alignment
and a solid fusion," Id. (citing R. 325), as well as the March 2004
MRI evaluated by Dr. Lee, which showed only "mild abnormalities."  ®.
25 (citing R. 446)).  The ALJ also discussed the observations of Dr.
Knox, who found in February 2004 that the claimant still experienced
neck pain after her final surgery but had experienced relief in her
arm pain.  ®. 25 (citing R. 332-33)).  Additionally, the ALJ discussed

Dr. Lee's report, which noted that the claimant was only in "mild distress" secondary to pain. ®. 25 (citing R. 445)).

The ALJ also considered the claimant's hearing testimony that she was no longer taking pain medications and that Ultram had been helpful in the past. ®. 25.)  The ALJ next discussed the lack of additional surgeries since the claimant's alleged onset date and a lack of recent physical therapy. Id. Finally, the ALJ stated that the claimant's reported activities of daily living -- which included an ability to take care of her personal needs, prepare simple meals, drive for simple errands, do light household chores, raise two children, and occasionally go out to eat -- were not consistent with her reported symptoms and limitations. ®. 23-24.)  The ALJ also noted that, since her alleged onset date, the claimant "has been able to attend school full-time, study for and pass her examination for a real estate license and work part-time in the real estate field." ®. 23.)

With respect to the claimant's depression, the ALJ found that her failure to seek mental health treatment undermined the credibility of her statements regarding the severity of her condition. ®. 25-26.) For example, the ALJ noted that "[a]lthough the claimant alleges that she has had depressive symptoms since 1991, there is no evidence of any treatment by a mental health professional until . . . 1999." ®. 25.)  The ALJ also discussed the claimant's recent failure to seek treatment.  The claimant testified that she had not received mental health treatment for at least the prior four months and was not taking psychotropic medications (with the exception of Adderall), allegedly because she was afraid of seeing a new doctor. ®. 26.)  However, the

ALJ did not find her reason credible "in light of the medical evidence of record, showing that the claimant has been examined and treated by many specialists" and the absence of "evidence showing an usual fear or anxiety about seeing new doctors."  Id.

Further, the ALJ found that the mental health evidence indicated that the claimant's psychiatric condition was mild and controllable with medications.  ®. 25.)  For instance, the ALJ noted a psychiatric examination which found only a mild impairment (June 2003 examination by Dr. Seibert, R. 168) as well as a "completely normal mental status examination" (July 2003 examination by Dr. Schilder, R. 255).  ®. 25.) The ALJ also discussed Dr. Sahandy's opinion that "most of the claimant's psychiatric problems could be controlled [with treatment]," ®. 25 (citing R. 364)), as well as Ms. Corcoran's own testimony that she was able to cope with her depression with medications.  ®. 26.)

The ALJ also explained that some of the claimant's statements regarding her limitations were contradicted by the record evidence. For instance, although the claimant indicated she was uncomfortable in public, the ALJ found that her part-time real estate work suggested no more than mild difficulties in social functioning.  ®. 23.)  Further, the ALJ observed that "although the claimant testified that she is irritable, Dr. Sahandy reported that [she] was cooperative and did not display any hostility."  Id.  The ALJ also contrasted the claimant's testimony that she has problems with concentration and memory with Dr. Siebert's observation that Ms. Corcoran was able to sustain attention throughout her examination.  ®. 24.)  Additionally, the ALJ discussed Dr. Siebert's finding that Ms. Corcoran had "no significant defects in

attention, concentration, or memory," and Dr. Schilder's observation that the claimant was a "good historian and that her attention span and concentration were normal." Id. Finally, the ALJ referenced Dr. Sahandy's finding that Ms. Corcoran "displayed normal memory and was able to perform serial 7's, although slowly." Id. See also Craig, 76 F.3d at 595 (explaining that the ALJ need not accept the claimant's allegations about her pain to the extent that they are inconsistent with the rest of the evidence of record).

Thus, in evaluating the claimant's pain, the ALJ considered the claimant's own statements about her pain, her medical history, objective medical evidence of pain, the claimant's daily activities, and treatment to alleviate the claimant's pain, in accordance with Craig, 76 F.3d at 595, and 20 C.F.R. § 416.1529(c). Moreover, this determination contained "specific reasons . . . supported by the evidence . . . and [was] sufficiently specific to make clear to the individual and to [the Court] the weight [given] to the individual's statements and the reasons for that weight." S.S.R. 96-7p.

Plaintiff argues, however, that this evaluation was inadequate. (Paper No. 17 at 39.) In support of this argument, plaintiff alleges that the ALJ's decision was not "mindful" of the claimant's various treatments, including: three cervical spine surgeries; knee surgery; multiple hospitalizations; therapy; "lumbar support"; and numerous pain and psychotropic medications. Id. at 40. The Court disagrees.

The ALJ opinion demonstrates that the ALJ explicitly discussed the claimant's cervical spine fusions, as well as her subsequent treatment and experience of pain. (See R. 21-22, 23.)

The ALJ also discussed various aspects of the claimant's medication regimen throughout her opinion. (See R. 22 (noting that the claimant was taking Wellbutrin and Klonopin; that Dr. Bautista treated her with medications through December 2002; and that the claimant received psychotropic medications through December 2005); R. 24 (stating that the ALJ considered the claimant's medication side effects; that the claimant testified that pain medications did not help her much and made her sick, that Paxil helped her improve, that she experienced "some improvement" with medications, and that she sleeps poorly without medications); R. 25 (noting that that claimant admitted at the hearing that she was no longer taking any pain medications and acknowledged that Ultram was helpful; that the ALJ reviewed Dr. Bautista's prescription notes and a medication renewal form; and that the claimant told Dr. Sahandy in 2004 that "her attitude was much better when she was on medications); R. 26 (noting that the claimant testified that "she was able to cope with her depression with medications" and was taking Adderall).)

In addition, the ALJ expressly referenced the claimant's physical therapy. (See R. 25 (the claimant "had physical therapy shortly after [her latest cervical fusion] surgery, but the record fails to show any recent physical therapy").) With respect to the claimant's lower back impairment, the record shows that the claimant received physical therapy from January 2005 to February 2005. ®. 392.) However, as discussed above, the only evidence of record pertaining to the lower back impairment (during the closed period) comes from these two months; thus, the ALJ did not err in failing to cite this therapy.

See 20 C.F.R. S 404.1520(a)(4)(ii) (the claimant must "have a severe .

. . impairment [or combination thereof] that meets the duration

requirement in § 404.1509 [12 continuous months]")

It is unclear what plaintiff exactly means in her reference to

"lumbar support."  If plaintiff means to argue that the ALJ did not

assess the claimant's lower back impairment, this argument is without

merit.  As discussed above, the ALJ discussed the entirety of the

claimant's treatment for her lower back and bilateral leg impairment.

(See R. 22-23.)

The ALJ did not discuss the claimant's 1997 knee surgery in her

opinion.  However, this procedure was performed seven years before the

alleged onset date.  Further, the record shows no subsequent treatment

notes regarding the claimant's knee.  Also, in her application for

disability and follow-up documentation, the claimant never alleged

disability due to knee pain.[13]  ®. 71, 97.)  Finally, the record

indicates that the ALJ did consider the knee surgery because she asked

the claimant about it at the hearing.  ®. 521.)

The ALJ referenced several of the claimant's hospitalizations

from before July 2003.  (See R. 21 (cervical fusions of May 1997 and

September 1997); R. 22 (treatment at emergency department of Shore

Behavioral Health System for depression and situational stress).)

Since her alleged date of disability onset, there appear to be four

hospitalizations.  First, the claimant underwent a cervical fusion in

late December 2003 to repair a pseudoarthritis.  ®. 322-31.)  The ALJ

---

[13] See supra at n. 9 (citing authorities for the principle that an ALJ
is not required to comment on every piece of evidence in the record,
and that an ALJ's failure to cite a specific piece of evidence is not
an indication that the evidence was not considered).

expressly referenced this hospitalization.  ℞. 21-22.)  Second, the

claimant was treated at the hospital in March 2004 with complaints of

a headache, tingling on the left side of her face, left arm pain, and

nausea.  ℞. 337-47.)  The physician noted that the claimant was in

only moderate distress and that her pain was relieved two hours after

the claimant's arrival.  ℞. 340.)  A CT scan of the brain was "normal"

℞. 345), and an imaging of the cervical spine revealed "no change

compared to previous study done December 30, 2003" ℞. 346).  The Court

concludes that the ALJ arguably should have cited this exhibit, but

failure to do so was harmless error.[14]  The ALJ cited several other

nearly contemporaneous pieces of medical evidence.  For example, the

ALJ noted the December 2003 X-ray, which "demonstrated satisfactory

alignment and a solid fusion," Id. (citing R. 325), as well as the

March 2004 MRI evaluated by Dr. Lee, which showed only "mild

abnormalities." ℞. 25 (citing R. 446)).  The ALJ also discussed the

observations of Dr. Knox, who found in February 2004 that the claimant

still experienced neck pain after her final surgery but experienced

relief in her arm pain.  ℞. 25 (citing R. 332-33)).  Even if the March

2004 hospitalization is indicative of a greater level of pain than

found by the ALJ, this does not undercut the ALJ's finding that the

claimant's statements concerning the persistence of her symptoms were

not entirely credible.  Further, as defendant points out, the ALJ

ultimately credited the claimant's March 2004 complaints of pain in

---

[14] See, e.g., Underwood v. Astrue, 2008 WL 4547820, *21 (W.D. Va. 2008)
(holding that "[the ALJ's] failure to thoroughly discuss [a particular
exhibit in the record] constitutes harmless error at best, as it did
not prohibit this court from determining whether the ALJ's findings
were supported by substantial evidence") (citing Camp v. Massanari,
2001 WL 1658913, *1 (4th Cir. 2001)).

the RFC.  (See R. 24 (limiting the claimant to work that is simple;
unskilled; has low stress; does not require lifting more than 10
pounds; and does not require constant overhead reaching or handling
/fingering).)  Third, the claimant was evaluated by Dr. Sohn in early
2005 for complaints of low back pain and bilateral leg pain, weakness.
®. 22 (citing R. 396).)  As discussed above, supra at § IV-A(3)(a),
the ALJ discussed this hospitalization.  Finally, the claimant was
treated at Shore Health System in June 2006 for pain in her neck, left
shoulder, and left arm.  ®. 483.)  However, plaintiff does not
identify any particular medical finding from this visit, and its
significance to the issues.  The most significant finding appears to
be that the claimant was in "mild" distress and had only "moderate"
pain.  ®. 496-97.)  The Court concludes that the ALJ arguably should
have cited this exhibit, but failure to do so was harmless error, as
discussed above with respect to the claimant's second
hospitalization.[15]  The Court also notes that the ALJ ultimately found
plaintiff's cervical spine impairment to be severe at Step 2.

    Plaintiff also submits the following argument:

        The ALJ's descriptions of Ms. Corcoran's daily
    activities also grossly understated the restrictions borne
    out in the record.  Ms. Corcoran's own descriptions of her
    daily activities both in the Function Report which she
    completed and in testimony given at her hearing more
    accurately describe the difficulties she experienced in
    carrying out her daily activities.

(Paper No. 17 at 40.)  The Court first notes that plaintiff has failed
to cite a single example of an understatement or mischaracterization

---

[15] See supra at n. 9 (citing authorities for the principle that an ALJ
is not required to comment on every piece of evidence in the record,
and that an ALJ's failure to cite a specific piece of evidence is not
an indication that the evidence was not considered).

by the ALJ of the claimant's descriptions of her daily activities.   As
a result, it is difficult for the Court to assess whether this claim
has merit.   The ALJ discussed the claimant's testimony that her daily
activities were limited in the following respects, for example: she is
only able to walk for five minutes, stand for 10 minutes, sit for 45
minutes, and lift up to five pounds; she avoids stairs and cannot
bend, kneel, stoop or squat; she sleeps poorly without medications;
she has problems with bathing; she rests in the afternoons and gets
irritable; it takes her several days to fold laundry; and she has
stopped going to her sons' school events.   ®. 24.)   In the absence of
any specific allegations of understatement, the Court concludes that
the ALJ properly discussed the claimant's daily activities.[16]

   D.   The ALJ Properly Considered the Combined Effect of All of the
   Claimant's Impairments, Both Severe and Not Severe

   Lastly, plaintiff argues that the ALJ failed to consider all of
her impairments in combination.   (Paper No. 17 at 40.)   For the
reasons below, the Court rejects this argument.

   The Social Security Act provides in pertinent part:

      In determining whether an individual's physical or
   mental impairment or impairments are of a sufficient medical
   severity . . . the [Commissioner] shall consider the
   combined effect of all of the individual's impairments
   without regard to whether any such impairment, if considered
   separately, would be of such severity.   If the
   [Commissioner] does find a medically severe combination of
   impairments, the combined impact . . . shall be considered
   throughout the disability determination process.

---

[16] See, e.g., Whittaker v. Astrue, No. SKG-07-3242, slip op. at 12 (D.
Md. 2009) (rejecting argument that the ALJ failed to consider two
alleged impairments in part because plaintiff "fail[ed] to bolster
that claim with any discussion, analysis, or argument").

42 U.S.C. § 423(d)(2)(B).  "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  Thus, "in evaluating the effect of various impairments upon a disability benefit claimant, the [ALJ] must consider the combined effect of a claimant's impairments and not fragmentize them."  Id. (citing Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985).  "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Walker, 889 F.2d at 50.

Plaintiff initially alleged disability in the form of a cervical spine injury and bipolar manic depression.  (R. 71, 20.)  Later, the claimant alleged additional impairments in the form of lower back pain and numbness and weakness in her left leg.  (R. 64, 20.)  As discussed above, see supra at § IV-A(2), the ALJ properly considered all of the claimant's impairments and their combined effect.  At the second step, for instance, the ALJ found the claimant's cervical spine impairment and depression to be severe; noted the claimant's 2000 diagnoses of generalized anxiety disorder and dysthymic disorder; noted her 2001 and 2002-03 diagnoses of bipolar disorder; noted Dr. Bautista's note that the claimant was being treated for bipolar disorder and ADHD; noted the claimant's 2004 diagnoses of bipolar disorder, ADHD, and anxiety and panic episodes.  (R. 22.)  The ALJ went on to discuss the claimant's low back and bilateral leg impairment, which the ALJ found to be not severe at the second step.  (R. 22.)

However, plaintiff argues that "the ALJ failed to consider [the claimant's] non-severe impairments" and their combined effect, which non-severe impairments allegedly included: status post right ankle fracture in 1981, status post left knee arthroscopic surgery for a torn meniscus in 1997, restless leg syndrome, hypothyroidism, sleep apnea, irritable bowel syndrome, hypertension, migraine headaches, bilateral knee arthritis, possible TMJ syndrome, recurring urinary tract infections, occipital neuralgia, lumbar radiculitis, and cubital fossa syndrome.  At the outset, the Court notes that plaintiff never alleged that many if not all of these impairments contributed to her disability beginning in July 2003.  In addition, plaintiff has simply listed these impairments without pointing to any evidence of record.

Before addressing each of these arguments, it is worth repeating that "[a]n ALJ is not required to comment on every piece of evidence in the record." Whittaker v. Astrue, No. SKG-07-3242, slip op. at 12 (D. Md. 2009); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Wall v. Astrue, 561 F.3d 1048, 1067 (10th Cir. 2009); 224 Fed.Appx. 574, 578 (9th Cir. 2007); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).  In addition, an ALJ's failure to cite a specific piece of evidence is not an indication that the evidence was not considered. Whittaker, No. SKG-07-3242 at 12; Black, 143 F.3d at 386.  Finally, the Court again notes that the regulations emphasize "relevant" evidence. See 20 C.F.R. § 404.1520a(c)(1) (the ALJ must consider "all *relevant* evidence to obtain a longitudinal

picture of [the claimant's] overall degree of functional limitation")

(emphasis added);   see also Moses v. Chater, No. SKG-96-1770, slip

op. at 14 (D. Md. 1997) ("The ALJ must consider all the relevant

evidence") (citing Arnold, 567 F.2d 258, 259 (4th Cir. 1977)).

There is very little evidence of record that the ankle fracture

or arthroscopic surgery -- both of which predated the date of alleged

disability onset by several years -- caused enduring pain or other

limitations.  Indeed, it appears that the claimant only addressed her

knee surgery in answer to a question posed by the ALJ at the hearing.

®. 521.)  The claimant testified only that her knee occasionally

swells, but not that it caused her any debilitating pain.  Moreover,

the Court cannot find any evidence pertaining to the fracture of the

claimant's right ankle, which occurred more than 25 years ago.  The

Court also notes that, according to the record, the claimant appears

to have worked continuously from 1992 to 2003.[17]  ®. 82.)

Similar problems arise with respect to plaintiff's hypertension.

There are some references in the record to a "past medical history" of

hypertension ®. 140) and "a history of borderline hypertension" ®.

155).  But there appears to be no evidence -- and plaintiff does not

point to any -- to the effect that plaintiff's hypertension caused her

to experience disabling pain or significant limitations.  The same is

true with respect to plaintiff's hyperthyroidism.  (See R. 198.)

There appears to be no evidence of record reflecting any treatment for

---

[17] See supra at n. 3, n. 8.

this impairment.   The claimant even testified at her hearing that she was "at a good level" with her hypothyroidism.[18]   ®. 526.)

Regarding the claimant's sleep apnea and restless leg syndrome, these impairments do not appear to have been persistent complaints, as defendant points out.   Indeed, there appears to be only one medical record related to those conditions, dated January 1998.   ®. 115.)   Dr. Whitesall opined that "medication to suppress leg movements would be anticipated to significantly improve sleep quality and improve the patient's complaints of hypersomnelence."   ®. 116.)   The record does not appear to reflect any subsequent treatment for or medications to address those two impairments.   See Whittaker, No. SKG-07-3242 at 12 (D. Md. 2009) (ALJ need only discuss each diagnosis and impairment for which there is supporting evidence of record).

The record also contains very few references to the claimant's irritable bowel syndrome and recurring urinary tract infections.   The only references to these impairments appear to be in "past history" sections of medical records.  (See, e.g., R. 198.)   Moreover, the claimant testified that both conditions were "generally controlled with medication."   ®. 525.)   She did not state that she experienced any limitations as a result of those conditions.   Id.

In February 2001, Dr. Heacock opined that plaintiff's headaches "could be related to the [possibility of] TMJ or could be migraine associated with an underlying inflammation."   ®. 157.)   In May 2006, Dr. Lee recorded the claimant's statement that she "saw a neurologist

---

[18] See supra at n. 3, n. 8.

two to three years ago and was told that she had a component of
occipital neuralgia." ®. 445.)  In July 2003, Dr. Schilder assessed
"some occipital neuralgia producing her right-sided head pain." ®.
256.)  An MRI of the head performed in response to the claimant's
headaches was "unremarkable." ®. 255.)  As defendant points out, each
of these conditions (migraine headaches, possible TMJ syndrome, and
occipital neuralgia) appears to be a possible diagnosis for the same
complaint -- headaches.  Although the ALJ did not characterize the
claimant's "daily headaches" as "possible TMJ syndrome," "migraine
headaches," or "occipital neuralgia," the ALJ expressly discussed that
condition.  (See R. 24 (noting that the claimant testified that she
has "constant pain in her neck as well as daily headaches").)[19]  The
ALJ even cited the above-referenced report of Dr. Schilder. ®. 24
(citing R. 254-65).)  Ultimately, however, the ALJ concluded that the
claimant's testimony regarding the limiting effects of her headaches
was not entirely credible. ®. 25; see also supra at § IV-C.)

Plaintiff also asserts that the ALJ should have discussed her
"lumbar radiculitis" when evaluating her impairments. (Paper No. 17
at 40.)  However, the ALJ expressly considered and discussed the
claimant's lower back pain in her decision, as discussed at length

---

[19] See Whittaker, No. SKG-07-3242 at 12 (D. Md. 2009) ("Plaintiff claims
that the ALJ failed to consider the alleged impairments of left
trochanteric bursitis, and cervical spondylosis. . .  Defendant points
out that trochanteric bursitis is the "inflammation of the
trochanteric bursa with pain on the lateral part of the hip and
thigh."  . . .  Therefore, [the ALJ] adequately evaluated [the
claimant's] left lower extremity pain and related problems, simply
utilizing different terminology.") (internal citations omitted).

above, and concluded that it had no more than a minimal effect on her ability to perform basic work activities.  ®. 22.)

Regarding the claimant's "bilateral knee arthritis," a report by Dr. Heacock dated January 2001 mentioned only a history of "some mild arthritis in her knees."  ®. 155.)  In January 2005, Dr. Sohn noted that the claimant "has seen a rheumatologist and was been worked up for . . . rheumatoid arthritis, which [he believed] has been *negative* so far."  ®. 398) (emphasis added).  In any event, the ALJ discussed the claimant's complaints of bilateral leg pain, weakness, tingling, and numbness" but concluded that there was no evidence that she had a leg impairment "which has more than a minimal effect on her ability to perform basic work activities."  ®. 22.)

Finally, the claimant argues that the ALJ should have discussed her cubital fossa syndrome -- a condition characterized by pain in or pertaining to the ulna or forearm.  (Paper No. 17 at 40; Dorland's Medical Dictionary 448 (31st ed. 2007).)  However, the ALJ discussed the claimant's "upper limb pain status post fusion" ®. 22), as well as her testimony that she experiences "constant left harm pain and numbness" and "occasional right shoulder pain" ®. 24).  As defendant points out, the ALJ limited the claimant to no constant overhead reaching, fingering or handling in her RFC.  ®. 26.)

It appears that "[plaintiff] is basically throwing in everything but the kitchen sink with these arguments, and these arguments are not reasons for reversible error.  McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998).

V.  Conclusion

For the above reasons, the Court AFFIRMS the decision of the Commissioner.  Accordingly, it is hereby ORDERED that plaintiff's Motion for Summary Judgment be DENIED and defendant's Motion for Summary Judgment be GRANTED.


Date: 9/22/09                              _____/s/_____
                                          Susan K. Gauvey
                                          United States Magistrate Judge